

# NUMBER 13-20-00387-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## IN THE INTEREST OF C.L.E.E.G., A CHILD

**On appeal from the 156th District Court
of Bee County, Texas.**

## MEMORANDUM OPINION

**Before Justices Benavides, Longoria, and Tijerina
Memorandum Opinion by Justice Tijerina**

G.G., the father, appeals the termination of his parental rights to his child, C.L.E.E.G.[1] By two issues, G.G. contends that the evidence is legally and factually insufficient to support a finding that he violated § 161.001(1)(E) and (Q) of the Texas Family Code as alleged by appellee the Texas Department of Family and Protective

---

[1] We use pseudonyms or initials to refer to appellant, the child, and other family members. *See* TEX. FAM. CODE ANN. § 109.002(d); *see also* TEX. R. APP. P. 9.8.

Services (the Department).[2] *See* Tex. Fam. Code Ann. § 161.001(1)(E), (Q). We reverse and render.

## I. BACKGROUND

On December 9, 2018, C.L.E.E.G. was born at twenty-five weeks gestation, and she spent several months in the hospital. At the time of C.L.E.E.G.'s birth, G.G. was in prison. However, he was released and visited C.L.E.E.G. in the hospital. G.G. went back to prison after pleading guilty to several offenses and receiving a seven-year sentence of confinement. C.L.E.E.G. remained in the hospital, and she was put in foster care upon her release from the hospital. G.G. has not seen C.L.E.E.G. since he was reincarcerated.

E.C., C.L.E.E.G.'s mother, had severe mental illness and a history of drug addiction. The Department became involved in this case because E.C. tested positive for methamphetamines when C.L.E.E.G. was born. After being appointed the temporary managing conservator of C.L.E.E.G., the Department filed a petition to terminate E.C.'s and G.G.'s parental rights to C.L.E.E.G. A bench trial was held.[3]

At trial, Troy Martinez, PhD, a licensed psychologist, testified as the Department's expert witness in forensic and clinical psychology. Dr. Martinez stated that after he performed a forensic psychological evaluation on E.C., his diagnostic impressions were that E.C. suffers from an "[u]nspecified psychotic disorder. Likely schizoaffective disorder, bipolar type. And amphetamine use disorder, severe, in sustained remission." The Department asked Dr. Martinez if he believed E.C. "was in a state of mind in which she

---

[2] G.G. is not challenging the sufficiency of the evidence to support the jury's finding that termination was in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2).

[3] E.C. is not appealing in this cause.

2

could appropriately care for children?" Dr. Martinez replied, "No."

Sandra Lopez, an investigator with the Department, testified that "[t]he [D]epartment received a referral for neglectful supervision on December 10th, 2018, the day after C.L.E.E.G. was born. And the issue was that [E.C.] had tested positive for methamphetamines and there were some concerns for [C.L.E.E.G.]." According to Lopez, E.C.'s positive drug result happened at the hospital when she gave birth to C.L.E.E.G., and the allegation was that E.C. had used drugs while pregnant.

After her birth, C.L.E.E.G. was transferred to Driscoll Children's Hospital. Lopez stated that G.G. was incarcerated in "Brooks County Jail" when C.L.E.E.G. was born, but he was released prior to the Department's removal of C.L.E.E.G. Lopez said, "The information that I received from the social worker at Driscoll Children's Hospital indicated that [E.C.] and [G.G.] had limited contact with [C.L.E.E.G.]. Although they were given vouchers for transportation and money to live in a hotel in Corpus in order to make it easier for them to visit with her daily." Lopez stated that she had visited C.L.E.E.G. at the hospital and both E.C. and G.G. were there, but neither parent wanted to speak with Lopez. Lopez testified that she was not able to speak with E.C. concerning her drug use because E.C. refused to speak with her. Lopez said, "The hospital staff [at Spohn South where C.L.E.E.G. was born] verified that [E.C.] had tested positive for methamphetamines. And there were some concerns for domestic violence between her and [G.G. reported by the staff at Driscoll Children's Hospital]." Lopez was unable to provide details about the concerns of domestic violence. Lopez stated that the Department decided to remove C.L.E.E.G. and E.C.'s other two children, and it sought

3

temporary managing conservatorship of all three children, which was granted. Lopez testified that C.L.E.E.G. was not tested for drugs when she was born. Lopez explained:

> The concern with the hospital was maintaining [C.L.E.E.G.'s] life. And because she was born at 25 weeks and she had to be resuscitated she was . . . immediately taken to Driscoll Children's Hospital. And meconium was not initially collected. She was at the Bee County Beeville Spohn Hospital until she went to Driscoll Children's Hospital. And at that time it took a few days to collect the meconium due to [C.L.E.E.G.] having difficulty having a bowel movement."

Nonetheless, according to Lopez, a drug test was eventually performed, and C.L.E.E.G. was negative for drugs. The remainder of Lopez's testimony related to E.C.'s other child D.D. On cross-examination by G.G.'s trial counsel, Lopez stated that she had one encounter with G.G. at the hospital on the day of the Department's removal of C.L.E.E.G. Lopez was not asked to elaborate.

Clarissa Perez, "the conservatorship caseworker for CPS," testified that she helped develop a family service plan for E.C. and G.G. Perez stated that the Department went over the family plan with G.G., but he has been unable to comply because there are no services provided where he is incarcerated. Perez said that although she had previously been able to visit G.G. in jail, he was transferred to a facility seven hours away from her, and she could no longer visit him. Perez attempted to have a substitute counselor assigned to visit G.G. in the new facility, but she received an email from the facility that "states that the warden is aware of the cases for CPS and the deadlines. And since [G.G.) is incarcerated . . . and will be in prison for longer than the length of our case he will not allow courtesy workers to visit with the parent."

Perez testified that C.L.E.E.G. had been in foster care in Robstown, Texas.

4

According to Perez, the placement has been meeting C.L.E.E.G.'s needs, and the foster parents would like to adopt her. Perez believed that it is in C.L.E.E.G.'s best interest for her foster family to adopt her. On cross-examination by G.G.'s trial counsel, Perez stated that she believed that G.G. received a seven-year sentence and that "[h]e is serving for burglary of a habitat, burglary of a building, possession of an illegal substance, possession of an illegal substance one to four grams, and felony . . . possession of a firearm." Perez testified that she and G.G. exchanged letters, and he informed her "that he was . . . enrolled to take a GED class. He was doing things to better himself. And that he was no longer affiliated with a gang." Perez agreed with G.G.'s trial counsel that "the investigator's description and recitation of [the Department's concerns] didn't make it sound like he was, per se, the offending parent." Perez stated that she informed G.G. that the Department's concerns were "for him to take parenting classes, individual counseling, [gain] employment, drug testing, and drug classes for drug use, [provide] a stable home[,] and cooperation [with the Department]." Perez did not state why the Department had these concerns. Perez testified that G.G. had told her that he wanted C.L.E.E.G. to stay with her sister D.D. and that he did not have any family members to care for C.L.E.E.G. Perez later clarified that G.G. mentioned his mother, but he did not want C.L.E.E.G. with her and did not provide her information so that Perez could perform a background check. G.G.'s trial counsel said, "But to refresh for this judge he has never given you a new name [of a family member] to suggest for a home study, right?" Perez replied, "Correct." Perez said, "He did say that he didn't feel anybody in his family was appropriate." Perez did not know whether G.G. had a relationship with E.C. Perez believed that G.G. had

5

C.L.E.E.G.'s "best interest at heart in trying to keep his daughter with family wherever that would be[.]"

G.G. testified that he is "incarcerated in [the] Telford Unit in New Boston, Texas. Kind of up here by Texarkana or Arkansas area, northeast Texas." G.G. stated that he pleaded guilty to several charges including possession of a controlled substance with intent to deliver and felon in possession of a firearm. G.G.'s sentence for these offenses is seven years' confinement. G.G. testified that he had previously been convicted of burglary of a habitation, placed on community supervision, and then the trial court revoked his community supervision because he violated the terms. G.G. was sentenced to six years in that case which occurred in 2009.

G.G. stated that he loves C.L.E.E.G. and that he has another child who lives with his mother. The Department said, "As I understand it you didn't think your mother would be best to take care of [C.L.E.E.G.]; is that correct?" G.G. replied,

> At the . . . time I wasn't sure. And me and my mom were . . . in a rough patch[.] But we've recently wrote each other. And I explained my situation. And I haven't got a response back from her yet. But I'm willing to say that if . . . Perez can make contact with her and have a conversation in regards of [C.L.E.E.G.'s] placement I mean that would be something I'm willing to consider until I'm released.

G.G. acknowledged that he had not made a request for C.L.E.G.G. to be placed with his mother prior to the trial and that C.L.E.G.G. had been in foster care since she was released from the hospital. G.G. testified

> I think it's good for [C.L.E.E.G.] to be with her sister, yes. But I'm not going to relinquish my rights because I feel that I . . . need the opportunity . . . to be a part of my daughter['s life]. While . . . I've been here I have signed up for a GRAD Program. I got out of the gang life by disassociating, and doing everything that I can, you know, for my daughter and change . . . my life and

6

be a father to my daughter. I just want the opportunity.

G.G. agreed that a seven-year sentence meant that he would not be released until 2026, but he claimed that it would be "unlikely" that he would actually serve his entire sentence. G.G. said "I should be out . . . this year, if not next year." G.G. stated that he is sure he would not serve a seven-year sentence. G.G. explained

> Because the parole [is] packed. The system is packed. I mean I'm here on a drug charge. They're kicking drug charges . . . . I would have already been out if I didn't have . . . the gang tag on me. You know that's the thing that I signed up for. I signed up for GRAD Program. And I . . . should be out this year, if not next year for sure.

G.G. agreed that if he was required to complete his sentence, C.L.E.E.G. would not know him. The Department asked G.G. if he believed it would be traumatic for C.L.E.E.G. if he took custody of her when he was released from prison in seven years. G.G. replied, "I mean yeah, but . . . it's not like this hasn't happened before. I mean there's other cases where it's happened. I mean it's not something that I would just—You know it's something that I would work slowly to but it's you know . . . ." G.G. agreed that C.L.E.E.G. received proper care with her foster family and stated that he would like for her to continue to receive proper care until he is released and can take custody of her. G.G. testified that he was willing to follow any plan required to get custody of C.L.E.E.G. once he is released.

The trial court admitted into evidence the judgment convicting G.G. of one count of possession of a controlled substance with intent to deliver, a first-degree felony, one count of possession of a controlled substance, a third-degree felony, and one count of felon in possession of a firearm, a third-degree felony committed on June 27, 2017, and

7

sentencing him to seven years' incarceration. The trial court admitted the judgment of conviction for an offense committed by G.G. on May 16, 2017, of possession of a controlled substance with intent to deliver. Finally, the trial court admitted the judgment revoking G.G.'s community supervision and convicting him of burglary of a habitation occurring on September 29, 2009.

C.L.E.E.G.'s foster mother testified that C.L.E.E.G. has been with her family since March 2019 when she was released from the hospital. According to C.L.E.E.G.'s foster mother, although she was premature, C.L.E.E.G. has met all her milestones and is healthy except for needing glasses. At the time of trial, C.L.E.E.G. was approximately a year and a half. C.L.E.E.G.'s foster mother stated that she wants to adopt C.L.E.E.G. and her sister D.D. and that she believes it would be in C.L.E.E.G.'s best interest if her family adopted her. On cross-examination by G.G.'s trial counsel, C.L.E.E.G.'s foster mother stated that the last time that G.G. visited C.L.E.E.G. was when she was in the hospital.

In its closing, the Department requested that the trial court terminate G.G.'s parental rights pursuant to § 161.001(b)(1)(Q) on the basis that "he is in confinement for a . . . period of two years or more from the date of the filing of the petition[,] . . . he committed acts that knowingly or intentionally led to that confinement[,] [a]nd . . . there is no ability to care for the children." The Department said, "It's very clear that not only is he not able to, but he is not able to present anybody who can." *See id.* §§ 161.001(b)(1)(E), (Q); 161.003. The trial court stated it would terminate G.G.'s parental rights to C.L.E.E.G. pursuant to § 161.001(b)(1)(E) and (Q). *See id.* § 161.001(b)(1)(E), (Q). The trial court also found that it was in C.L.E.E.G.'s best interest that E.C.'s and G.G.'s parental rights

8

be terminated. *See id.* § 161.001(b)(2).[4]

The trial court appointed the Department C.L.E.E.G.'s permanent managing conservator and left her in the foster family's care. The trial court stated that the Department should reach out to G.G.'s mother in order to assess whether she is interested in an ongoing relationship with C.L.E.E.G. G.G.'s trial counsel asked the trial court to clarify if it had sua sponte determined to terminate G.G.'s parental rights pursuant to § 161.001(b)(1)(E). *See id.* § 161.001(b)(1)(E). The trial court replied, "Well, the 'E' ground was pled, and the evidence supported it. And so what [the Department] may have argued . . . I didn't sua sponte add it to anything. It was pled and was a ground for termination that I feel was abundantly proved by the evidence in addition to the—the argued ground by [the Department]." The Department responded that it had "pled [it as a] ground and [that it had] presented the evidence on it"; therefore, the Department asserted that the trial court was "more than able to find that" a violation of that ground had occurred and that the trial court was "certainly not bound by [the Department's] argument and request." The trial court signed a decree terminating G.G.'s parental rights pursuant to § 161.001(b)(1)(E) and (Q) of the family code. *See id.* § 161.001(b)(1)(E), (Q). This appeal followed.

## II. STANDARD OF REVIEW

Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties, and powers normally

---

[4] The trial court terminated E.C.'s parental rights to C.L.E.E.G. and her two siblings pursuant to § 161.001(b)(1)(E), (O) and § 161.003. The trial court also terminated the parental rights of the fathers of E.C.'s two other children. Neither father is a party in this appeal.

existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see In re D.S.P.*, 210 S.W.3d 776, 778 (Tex. App.—Corpus Christi–Edinburg 2006, no pet.). Therefore, termination of the parent-child relationship must be supported by clear and convincing evidence. *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Before terminating the parent-child relationship, the trial court must find by clear and convincing evidence that the parent committed one of the acts prohibited by § 161.001(1)(A–T) of the Texas Family Code and that termination is in the child's best interest. TEX. FAM. CODE ANN. §§ 153.002, 161.001(1)(A–T); *In re J.L.*, 163 S.W.3d at 84.

The "clear and convincing" intermediate standard falls between the preponderance of the evidence standard of civil proceedings and the reasonable doubt standard of criminal proceedings. *Porter v. Tex. Dep't of Protective & Regul. Servs.*, 105 S.W.3d 52, 57 (Tex. App.—Corpus Christi–Edinburg 2003, no pet.). It is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). In our legal sufficiency analysis, we must view the evidence in the light most favorable to the finding, and we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (internal quotations omitted). However, this does not mean that we must disregard all evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. Because of the heightened standard, we must also be mindful of any undisputed evidence contrary

to the finding and consider that evidence in our analysis. *Id.* If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is true, we must hold the evidence to be legally insufficient and render judgment in favor of the parent. *Id.*

In a factual sufficiency review, "[w]e must determine whether, on the entire record, a fact[]finder could reasonably form a firm conviction or belief that the parent violated a provision of section 161.001(b)(1) and that the termination of the parent's parental rights would be in the best interest of the child." *In re M.C.T.*, 250 S.W.3d 161, 168 (Tex. App.—Fort Worth 2008, no pet.) (citing *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002)). Under this standard, we consider whether the "disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266.

A parental-rights termination decree must be based on at least one predicate ground. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). If multiple predicate grounds are found by the trial court, we affirm based on any one ground because only one is necessary for termination of parental rights. *In re T.N.F.*, 205 S.W.3d 625, 629 (Tex. App.—Waco 2006, pet. denied). Therefore, to prevail on appeal, a party must challenge the sufficiency of each affirmative finding of a predicate ground for termination or at minimum challenge the best interest finding. *In re S.N.*, 272 S.W.3d 45, 49 (Tex. App.—

11

Waco 2008, no pet.). However, if a parent's parental rights are terminated pursuant to § 161.001(b)(1)(E), we must determine whether the evidence supports that finding even if there are other grounds for termination. *See Interest of N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) ("[D]ue process . . . requires a heightened standard of review of a trial court's finding under [§] 161.001(b)(1)(D) or (E), even when another ground is sufficient for termination. . . .").

### III. TERMINATION PURSUANT TO § 161.001(b)(1)(E)

In his first issue, G.G. contends that the Department presented legally and factually insufficient evidence to support the trial court's finding that termination of his parental rights was appropriate under § 161.001(b)(1)(E). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Specifically, G.G. argues that "the Department did not produce any evidence at trial that [he] either engaged in conduct or knowingly placed the child with persons who engaged in conduct, that endangered her physical or emotional well-being" and he "never 'placed' the child anywhere as she went directly from the hospital where she was born to a foster home where she has remained."

### A. Applicable Law

Section 161.001(b)(1)(E) provides for termination of parental rights if there is clear and convincing evidence supporting a finding that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id*. In *Tex. Department of Human Services v. Boyd*, the Texas Supreme Court explained that "'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment,

12

[and] it is not necessary that the conduct be directed at the child or that the child actually suffers injury." 727 S.W.2d 531, 533 (Tex. 1987). The court stated, "Rather, 'endanger' means to expose to loss or injury; to jeopardize." *Id*. And it determined that "imprisonment is certainly a factor to be considered by the trial court on the issue of endangerment." *Id*. However, "mere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child." *Id*.

When analyzing an allegation under § 161.001(b)(1)(E) the focus is on the parent's conduct, either by act or omission. *Id*. Termination pursuant to § 161.001(b)(1)(E) must be supported by evidence of the parent's voluntary, deliberate, and conscious course of conduct and not an isolated act or omission. *Id*. "Endangering conduct may include the parent's actions before the child's birth, while the parent had custody of older children, including evidence of [illegal] drug usage." *Id*. Endangerment may include a parent's drug usage, or another parent allowing a child to be around a parent or other persons using drugs. *Dupree v. Tex. Dep't of Prot. & Regul. Servs.*, 907 S.W.2d 81, 84–86 (Tex. App.— Dallas 1995, no writ). "Conduct that demonstrates awareness of an endangering environment is sufficient to show endangerment." *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

## B.    Discussion

The evidence at trial focused on E.C.'s prior drug use, E.C.'s drug induced mental illness, E.C.'s failure to complete her family plan, and her treatment of her other children not related to G.G. Most of the evidence presented relates to E.C.'s ability to care for C.L.E.E.G. and her other two children. The Department's evidence regarding G.G.

focused solely on his incarceration. Other than an assertion by Lopez that some unknown person at the hospital stated that family violence potentially occurred between G.G. and E.C. while they were visiting C.L.E.E.G., there is nothing specific in the record regarding G.G.'s interactions with E.C.

The Department's evidence regarding G.G.'s incarceration, as stated above, is not sufficient alone to support termination under § 161.001(b)(1)(E). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E); *Boyd*, 727 S.W.2d at 534 ("We hold that if the evidence, including the imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child, a finding under section 15.02(1)(E) is supportable."); *see also Interest of K.M.*, No. 01-19-00285-CV, 2019 WL 3949483, at *8 (Tex. App.—Houston [1st Dist.] Aug. 22, 2019, pet. denied) (mem. op.) ("The evidence of Father's prior convictions and other criminal conduct, while perhaps insufficient alone to support a finding of endangerment, is evidence that the trial court could have reasonably considered together with the evidence of the parents' consistent drug use in finding that termination was justified under subsection (E)."); *In re M.M.*, No. 13-13-00543-CV, 2014 WL 895514, at *6 (Tex. App.—Corpus Christi–Edinburg Mar. 6, 2014, no pet.) (mem. op.) (finding that the evidence was legally and factually sufficient to support a finding under § 161.001(b)(1)(E) due to mother's endangering conduct of, among other things, being incarcerated, using drugs while the child lived with her, and abandoning the child); *Interest of D.L.B.*, No. 11-19-00034-CV, 2019 WL 3227592, at *3 (Tex. App.—Eastland July 18, 2019, pet. denied) (mem. op.) (explaining that the evidence was sufficient to support a finding pursuant to § 161.001(b)(1)(E) because the father "had

14

a history of violence and irresponsible choices, and the trial court could have determined from this evidence that Appellant voluntarily engaged in an endangering course of conduct"); *Interest of A.E.T.*, No. 10-19-00095-CV, 2019 WL 2557491, at *3 (Tex. App.—Waco June 19, 2019, no pet.) (concluding that the father's "drug use, criminal activity to support his drug habit which included illegally trafficking adults and children after he was aware of the Department's concerns regarding the children, his ongoing gang affiliation, and incarceration, viewed in the light most favorable to the subsection (E) finding, was legally sufficient). Moreover, the Department presented no evidence that G.G. has a history of drug use or abuse in C.L.E.E.G.'s presence or that his use of drugs, if any, would affect his ability to parent her.[5] *See Interest of L.C.L.*, 599 S.W.3d 79, 85–86 (Tex. App.—Houston [14th Dist.] 2020, pet. pending.) (en banc) (explaining that an endangering finding pursuant to § 161.001(b)(1)(E) is legally insufficient when there is no evidence of a causal connection between the parent's drug use and the endangering conduct because evidence of drug use alone is insufficient).

Because C.L.E.E.G. went into foster care immediately after her birth and release from the hospital, G.G. had limited time with her and limited control over her environment. Nothing in the record indicates that G.G. ever spent an unsupervised minute with C.L.E.E.G. Moreover, although G.G. had been previously incarcerated and was again incarcerated at the time of the trial, no evidence was presented of its effect on a G.G.'s

---

[5] We note that the evidence showed that G.G. had been convicted for possession of a controlled substance with intent to deliver. However, the Department did not ask G.G. for any details regarding those offenses; therefore, we cannot conclude that an inference that G.G. abused illegal drugs can be firmly founded in the record as required by a clear and convincing standard of review. *See Interest of L.C.L.*, 599 S.W.3d 79, 85–86 (Tex. App.—Houston [14th Dist.] 2020, pet. pending.) (en banc).

ability to parent C.L.E.E.G. once released. Therefore, the Department presented no evidence of G.G.'s voluntary, deliberate, and conscious course of conduct of endangering C.L.E.E.G. Viewing the evidence in the light most favorable to the finding, assuming that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so and disregarding all evidence that a reasonable fact finder could have disbelieved or found to have been incredible, we conclude that the evidence was not sufficiently clear and convincing that a reasonable fact finder could have formed a firm belief or conviction that G.G. engaged in conduct which endangered the physical or emotional well-being of C.L.E.E.G. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Nonetheless, termination pursuant § 161.001(b)(1)(E) is proper if the evidence supports a finding by clear and convincing evidence that G.G. knowingly placed C.L.E.E.G. with persons who engaged in conduct which endangered her physical or emotional well-being. *See id.*

Here, the evidence established that E.C. abused drugs while she was pregnant with C.L.E.E.G. and that she had an addiction to methamphetamine which caused her to suffer from drug induced mental illness. Moreover, the evidence showed that E.C.'s drug use affected her life negatively and that she was not able to parent C.L.E.E.G. due to her drug use and addiction. However, to terminate G.G.'s parental rights under subsection E for E.C.'s drug use, the evidence must indicate G.G. knowingly allowed C.L.E.E.G. to remain with E.C. despite her inability to care for C.L.E.E.G. due to her drug abuse and mental illness. There was no evidence presented that G.G. was aware of E.C.'s drug use during her pregnancy with C.L.E.E.G. or that he knew that she was unable to care for her other children. *Jordan*, 325 S.W.3d at 721 ("It is not necessary that the parent's conduct

16

be directed towards the child or that the child actually be injured; rather, a child is endangered when the environment creates a potential for danger which the parent is aware of but disregards."); *Interest of M.D.M.*, 579 S.W.3d 744, 765 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (concluding that evidence supported a finding that the fathers "knowingly placed the child[ren] with persons who engaged in conduct which endangers the physical or emotional well-being of the child[ren]" because there had been evidence that the fathers had been informed "of the unsafe environment in Mother's household, including . . . that Mother was using drugs," and the fathers were asked to help "remove the children from Mother's care, but neither [father] provided any assistance."). The Department did not present any evidence of G.G.'s acts or omissions that exposed C.L.E.E.G to loss or injury or jeopardized her well-being before or after her birth. *See Jordan*, 325 S.W.3d at 721 (explaining that the parent's conduct which demonstrates the parent's awareness of an endangering environment is sufficient to show endangerment); *Interest of M.D.M.*, 579 S.W.3d at 765 (noting the father's awareness of the mother's drug use as a supporting factor). The Department did not present any evidence regarding G.G.'s relationship with E.C., except for testimony that someone became concerned that potential family violence occurred when G.G. and E.C. visited C.L.E.E.G. in the hospital. Without more detail, we are unable to say this evidence would cause a person to form a firm belief that domestic violence occurred. The evidence showed that after C.L.E.E.G. was born, she was not released to E.C., and when she was released from the hospital, she went to her foster home.

17

Viewing the evidence in the light most favorable to the finding, assuming that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so and disregarding all evidence that a reasonable fact finder could have disbelieved or found to have been incredible, we conclude that no reasonable trier of fact could have formed a firm belief or conviction that G.G. knowingly placed C.L.E.E.G. with persons who engaged in conduct which endangered her physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E); *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002) (explaining the clear and convincing standard of review). Accordingly, we conclude that the evidence is legally insufficient to support termination pursuant § 161.001(b)(1)(E).[6] *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). We sustain G.G.'s first issue.

## IV.  TERMINATION PURSUANT TO § 161.001(b)(1)(Q)

A trial court may terminate the parent-child relationship pursuant to § 161.001(b)(1)(Q) if the trial court finds, by clear and convincing evidence, that the parent knowingly engaged in criminal conduct that resulted in the parent's (1) conviction of an offense and (2) "confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition." *In Interest of H.O.*, 555 S.W.3d 245, 250–54 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (citing TEX. FAM. CODE ANN. § 161.001(b)(1)(Q)). Subsection (Q) "allows the State to act in anticipation of a parent's abandonment of the child and not just in response to it." *Id.* "[S]ubsection Q purports to protect children whose parents will be incarcerated for periods exceeding two

---

[6] Having found the evidence legally insufficient to support the trial court's termination pursuant to § 161.001(b)(1)(E), we need not address G.G.'s argument to the extent he may allege that the evidence is factually insufficient to support termination pursuant to § 161.001(b)(1)(E). *See* TEX. R. APP. P. 47.1.

18

years after termination proceedings begin." *Id.*

A two-year sentence "does not automatically meet subsection Q's two-year imprisonment requirement" and the availability of parole is relevant to determining whether the parent will be released within two years. *Id.* However, as "parole decisions are 'inherently speculative' and rest 'entirely within the parole board's discretion,' the '[m]ere introduction of parole-related evidence . . . does not prevent a factfinder from forming a firm conviction or belief that the parent will remain incarcerated for at least two years.'" *Id.*

The evidence must establish that "the parent will be incarcerated or confined and is unable to care for the child for at least two years from the date the termination petition is filed." *Id.* The burden then shifts to the parent to "produce some evidence as to how they would provide or arrange to provide care for the child during that period." *Id.* If the parent succeeds in his burden, the Department must establish that the arrangement would not satisfy the parent's duty to the child. *Id.*

The Department presented evidence that pursuant to a plea agreement with the State, on May 16, 2019, G.G. was sentenced to seven years' confinement for possession of a controlled substance with intent to distribute and felon in possession of a firearm. G.G. stated that he would be eligible for parole soon because his conviction was for a non-violent drug offense and the jails were releasing non-violent offenders due to Covid-19. G.G. testified that he was taking steps in a jail program to exit from his gang, which he believed increased the likelihood of parole. G.G. agreed, however, that his eligibility for parole was not guaranteed and that it was possible that he could end up serving the

19

entire seven-year sentence. The Department presented no evidence regarding availability of parole under the circumstances of G.G.'s case.

"Because the natural right between a parent and his child is one of constitutional dimensions," proceedings to terminate parental rights must be strictly scrutinized. *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). The Department has the burden to prove its case with "clear and convincing proof*." In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). However, in this case, the Department only presented evidence that G.G. was sentenced to a seven-year term, without providing any evidence that parole would not be available to G.G. As previously stated, evidence of incarceration alone does not automatically establish termination pursuant to subsection Q; therefore, the Department did not met its burden to produce clear and convincing evidence that G.G.'s parental rights should be terminated pursuant to subsection Q. Thus, the burden did not shift to G.G. Moreover, there is no favorable evidence to a finding that G.G. will be incarcerated for seven years and cannot care for C.L.E.E.G. as he testified that he believed he would be paroled in the near future, and the Department presented no evidence otherwise. *See In re H.O.*, 555 S.W.3d 245, 250–54 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). Without evidence showing that G.G. would not be eligible for parole within two years of the Department's petition, there is nothing for the trial court to weigh regarding whether the Department met its burden under subsection Q. Under these circumstances, we cannot conclude that the trial court had a basis to find by clear and convincing evidence that G.G. would remain incarcerated two years from the date the Department filed its termination petition on

January 17, 2020.[7] Accordingly, the evidence is legally insufficient to support a finding that parental termination should occur pursuant to subsection Q. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(Q). We sustain G.G.'s second issue.

## V.    CONCLUSION

Having concluded that the evidence is legally insufficient to support the predicate finding of endangerment under Texas Family Code § 161.001(b)(1)(E) and (Q), we reverse the trial court's judgment and render a verdict denying the Department's petition to terminate.[8]

JAIME TIJERINA
Justice

Delivered and filed on the
4th day of February, 2021.

---

[7] We note that although the trial court asked the Department to reach out to G.G.'s mother in order to assess whether she is interested in an ongoing relationship with C.L.E.E.G., there is nothing in the record indicating that the Department did so. Nonetheless, the evidence does not support a finding by clear and convincing evidence that G.G. was unable to care for C.L.E.E.G. during the requisite two-year period.

[8] We do not disturb other parts of the trial court's order, including the appointment of the Department as the child's permanent managing conservator because G.G. does not challenge any part of the order other than the termination of his parental rights. *See In re J.A.J.*, 243 S.W.3d 611, 617 (Tex. 2007).

21